**JOHN DILORENZO, JR., OSB #802040**
johndilorenzo@dwt.com
**AARON K. STUCKEY, OSB #954322**
aaronstuckey@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
Telephone:  (503) 241-2300
Facsimile:  (503) 778-5299

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AT EUGENE

| | |
|---|---|
| **MARION COUNTY,** a political subdivision of the State of Oregon, and **LINN COUNTY,** a political subdivision of the State of Oregon,<br><br>Plaintiffs,<br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | Case No. 6:24-cv-00781<br><br>**COMPLAINT**<br><br>Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. – Negligence and Negligence *Per Se* |

## I.     INTRODUCTION.

1.     This case arises out of the United States Forest Service's negligent failure to follow its own mandated fire attack plan and the resulting destruction of nearly 200,000 acres of forestland in the Willamette National Forest and adjoining private lands.  Plaintiffs Marion County and Linn County incurred approximately $4,600,000.00 in damages as a direct result of the Forest Service's negligence.

2.     The Beachie Creek Fire originated in the Opal Creek Wilderness and was first observed by the Forest Service on the morning of August 16, 2020, when it was a modest 3.5

Page 1 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

acres in size. Understanding the fire regime in the Western Cascades and recognizing the significant potential for the small ignition to turn into a conflagration, the Forest Service ordered the fire to be treated as a "full suppression" incident.

3. The "full suppression" designation requires the Forest Service to "put the fire out, as efficiently and effectively as possible" and to "halt the fire spread and cool down all hot spots" until the firelines "can reasonably be expected to hold under foreseeable conditions." To achieve that goal, the Forest Service directed its firefighters to fight the Beachie Creek Fire by utilizing helicopter water drops and other aviation resources to suppress and contain it.

4. Despite that directive, the Forest Service failed to sufficiently utilize the helicopters and other aviation resources that were available to suppress and contain the Beachie Creek Fire. Its initial attack, which the Forest Service recognizes as the best opportunity to control a wildland fire, was entirely unsuccessful at containing the fire, leaving the fire 0% contained. After that failed initial attack, the Forest Service failed to drop any water on the fire for nearly two weeks.

5. During that time, weather conditions provided the Forest Service with the maximum opportunity to suppress and contain the fire, consistent with its mandated "full suppression" designation. As one member of the idled helicopter crews put it, they could have "drowned" the fire with sufficient water drops. However, the helicopters and other aviation resources remained on the ground, idle.

6. The Forest Service recognized that the worsening of fire weather conditions could be catastrophic and directed that a significant change in those conditions, such as an east wind, was a "watchout" event. Under such circumstances, the full suppression designation required redoubled efforts at aerial suppression and containment.

7. As the Forest Service predicted, in late August, the foreseeable fire weather conditions shifted drastically, and the fire began to grow quickly. However, even as fire weather conditions deteriorated, the Forest Service helicopters and other aviation resources remained on

Page 2 – COMPLAINT

the ground, contrary to the full suppression designation, the agency's Incident Decision directives, and the watchout trigger.

8. On September 7, 2020, the Beachie Creek Fire exploded. High winds from the east tore through Western Oregon. The dry fuels in the path of the Beachie Creek Fire erupted, and the fire grew from 776 acres to more than 130,000 acres in less than 24 hours.

9. As a result of the Forest Service's negligent failure to follow its own mandated fire attack plan, the Beachie Creek Fire grew from a smoldering 3.5 acres into a firestorm that ultimately destroyed nearly 200,000 acres, took six lives, destroyed multiple towns within Marion and Linn Counties, and dramatically changed the landscape of the Willamette National Forest. This civil action seeks to compensate Plaintiffs for their damaged and destroyed property and other damages that they incurred are a direct result of the Forest Service's negligence.

## II.    JURISDICTION AND VENUE.

10. This Court has original jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1346(b)(1). Venue is proper in the District of Oregon, Eugene Division, because a substantial part of the events giving rise to the claims occurred in Marion County and Linn County in the State of Oregon. 28 U.S.C. § l391(b)(2).

## III.    PARTIES.

11. Plaintiff Marion County is a county in the State of Oregon. Marion County owns significant real property and personal property in or around the areas affected by the Beachie Creek Fire, and it provides various emergency services to its residents within the county.

12. Plaintiff Linn County is a county in the State of Oregon. Linn County owns significant real property and personal property in or around the areas affected by the Beachie Creek Fire, and it provides various emergency services to residents within the county.

13. Defendant United States acted by and through its employees, agents and representatives with the United States Forest Service. The Forest Service is an administrative agency of the United States that is responsible for the administration, maintenance and protection

Page 3 – COMPLAINT

of the National Forests, including the Willamette National Forest where the major events of this case took place.

## IV.    ADMINISTRATIVE EXHAUSTION.

14. In accordance with 28 U.S.C. §§ 2672 and 2675, Plaintiffs provided the Forest Service with notice of the claims in this action via letter dated September 2, 2022.

15. By separate letters both dated November 15, 2023, the Forest Service denied those claims.

16. In accordance with 28 U.S.C. §§ 2401(b) and 2675(a), Plaintiffs' action is timely filed within six months of the date of denial.

## V.    FACTS.

**A.    The Forest Service has Long Understood the Dangerous Conditions that Cause Extreme Wildfires in the Pacific Northwest.**

17. The wildfires that ravaged Oregon in 2020 were not unprecedented, but rather were remarkably consistent with historic fires. Reports from the early 1900s, along with the prehistoric record, show that similarly large and catastrophic wildfires have regularly occurred in the Pacific Northwest over the past millennium, leaving uniformly aged stands of Douglas Fir across Western Oregon at intervals of 100 to 250 years. As in 2020, many of those historic fires occurred in late August or early September, under similar weather conditions and even in similar locations. A consistent theme throughout is the combination of strong east winds and unusually dry conditions.

18. The Forest Service has long known the conditions necessary to generate extreme wildfires in the Pacific Northwest. In 1957, it commissioned a meteorological study that analyzed the frequency of dry east wind events in the Pacific Northwest. That study noted that "the history of forest conflagrations in the northwest is, for the most part, a history of the simultaneous occurrence of small fires and severe east winds." The study recognized that these east wind events consist of "exceptionally dry wind from an easterly quadrant that may blow

Page 4 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

continuously for 24 to 48 hours or longer, sometimes at gale force, and often reaching maximum strength during night and early morning hours." The study explained that these wind events are "accompanied by relative humidities that remain extremely low around the clock," and noted that "under these conditions fires run wild, and fire-controlmen must be prepared for the worst."

19.     This study noted many historical catastrophic fires in the region and explained the meteorological conditions that create the east winds that drive such fires. It concluded that "the impact of east winds on fire occurrence is likely to be greatest in September, the month of greatest increase in frequency at all levels." Thus, as early as 1957, the Forest Service understood the combination of weather events that can create catastrophic wildfires in the Pacific Northwest, that they are a regular feature of weather in this region, and that they are predictably at their worst in August and September.

    **B. Forest Service Aviation Resources have a Very High Success Rate When Used for the Initial Attack on Wildland Fires.**

20.     Wildland fire management agencies, including the Forest Service, have been successful in suppressing 95-98% of unwanted fires in the initial attack phase before the fire expands beyond 100 acres of forested land. The Forest Service strives for an initial attack success rate of 98%, and it relies on aerial fire-fighting assets such as helicopters to achieve these high success rates.

21.     The Forest Service utilizes three classes of helicopters for fighting wildland fire. Type-1 helicopters are large, heavy-duty aircraft that can carry as much as 3,000 gallons of water in a single drop. Type-2 helicopters are medium-sized aircraft that can carry as much as 500 gallons of water in a single drop. Type-3 helicopters are generally used for observation and support work, but are capable of making drops of up to 150 gallons of water.

22.     In March of 2020, the United States Department of Agriculture published a study on the effectiveness of aerial firefighting assets, including helicopters. That report concluded

Page 5 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

that the success rate for helicopter fire suppression, particularly when used in the initial attack before a fire grows beyond 100 acres, was very high.

23. The Forest Service recognizes that the rapid deployment and appropriate concentration of wildfire response resources at the decisive time and place are essential to successful wildfire response actions.  In other words, the Forest Service knows that initial attack via helicopter is a highly effective tool to successfully suppress wildfires and that the deployment of such resources must be done quickly and at the appropriate level of intensity to secure a successful result.

      C.      **In the Summer of 2020, the Willamette National Forest Experienced Extreme Wildfire Conditions.**

24. The recipe for extreme wildfires in the Pacific Northwest is clear:  late summer drought, an ignition, and a strong east-wind event.  While such east winds are rare early in the summer, they increase in frequency in mid-August and September until seasonal rains begin.  Unfortunately, the timing of these east-wind events coincides with the driest period of the summer in the Pacific Northwest.

25. The west side of the Cascades is not known for frequent fires. However, the relative infrequency of fire results in more intense fires due to the density and multi-tiered character of the forest understory that has been allowed to develop in west-side forests.

26. In the summer of 2020, fuels density in the Willamette National Forest was at an extremely dangerous level.  That summer, the National Interagency Fire Center and U.S. Drought Monitor noted that the wildfire potential in Oregon was above normal due in part to extreme drought conditions on both sides of the Cascade Mountains.  By August of 2020, the west slope of the Cascades was experiencing hot and arid conditions, and those fuels had become tinder dry.

Page 6 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

### D. The Forest Service Designated the Beachie Creek Fire as a "Full Suppression" Incident.

27. The Beachie Creek Fire was first discovered in the Opal Creek Wilderness on August 16, 2020, at approximately 11:30 a.m. By early afternoon, the fire had grown to 3.5 acres and was described as "creeping" and "smoldering with isolated torching." In its initial Incident Status Summary ("ICS-209") report, the Forest Service rated the spread potential as "high," and designated the fire as a "full suppression" incident for 100% of the initial attack against the fire.

28. A "full suppression" designation is the agency's most aggressive fire-fighting strategy, requiring the Forest Service to:

> "put the fire out" as efficiently and effectively as possible, while providing for firefighter and public safety. To complete a Fireline around a fire to halt fire spread and cool down all hot spots that are [an] immediate threat to control line or outside the perimeter, until the lines can reasonably be expected to hold under foreseeable conditions. Full Suppression is synonymous with "Full Perimeter Containment" and "Control."

29. In its Interagency Standards for Fire and Fire Aviation Operations, the Forest Service defines "suppression" as "[m]anagement action to extinguish a fire or confine fire spread beginning with its discovery."

30. The strategic objectives for fighting the Beachie Creek Fire were to "suppress the incident at the smallest possible size using a combination of direct and indirect attack." The Forest Service directed that the initial 24-hour response was to "slow fire spread" using "water drops from helicopters."

31. Even at that early juncture, the Forest Service recognized that there was a significant threat of the "potential for east wind events" that could lead to negative impacts, including the threat of the fire spreading to private lands. The Forest Service also recognized that there was a "critical need" for "Type-1 and 2 helicopters to slow fire spread and attempt to implement [a] successful direct attack strategy."

Page 7 – COMPLAINT

E.  **The Forest Service Directed that the Full Suppression Strategy Would be Secured via Helicopter Water Drops.**

32.  The Forest Service Manual and Forest Service Handbook require the Forest Service to use the Wildland Fire Decision Support System (the "WFDSS") to guide and document all decisions during a wildfire. This includes the Incident Decision, which is the governing document published by the Forest Service that identifies risks, objectives, direct courses of action, and explains the rationale supporting fire-fighting decisions. WFDSS Incident Decisions are the official Forest Service record of how managers are directing the agency to respond to wildfires.

33.  On August 19, 2020, the Forest Service issued its first WFDSS Incident Decision for the Beachie Creek Fire (the "8/19 Incident Decision").

34.  The 8/19 Incident Decision directed the Forest Service to "utilize aviation resources to slow fire spread and Type-1 crews to determine if direct attack can be safely implemented with a Type-3 organization." The 8/19 Incident Decision reiterated that the Beachie Creek fire was a "full suppression" incident. Because the chance for fire growth beyond the Opal Creek Wilderness was "high," the 8/19 Incident Decision directed action to "suppress the fire." The 8/19 Incident Decision recognized that "certain low-probability, high-consequence fire growth factors such as 'east wind events' have historically occurred in August and September," and directed fire managers to consider those as "watch out situations."

F.  **The Forest Service Ignored Its Own Directive by Failing to Fully Utilize its Helicopters.**

35.  The Forest Service had two Type-1 helicopters available and assigned to the Beachie Creek fire on August 16 and 17. However, despite the availability of those helicopters, the full suppression designation, and the 24-hour directive to utilize water drops to achieve that full suppression objective, neither of those helicopters made any water drops on the fire and one of them remained grounded for both days.

Page 8 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

36. On August 18, the Forest Service had both a Type-1 and a Type-2 helicopter available and assigned to the fire. The Type-1 helicopter was a Boeing CH-47D "Chinook" that was capable of dropping 2,800 gallons in a single drop. Given the proximity of the fire and the nearest water source, it could have made a water drop every 15 minutes and could operate for up to 10 hours a day.

37. However, the Forest Service failed to adequately utilize those resources. Between August 18 and August 21, it had both Type-1 and Type-2 helicopters available and assigned to the Beachie Creek fire, but it left them idle on the ground for the vast majority of that time as detailed below:

   a. On August 18, it flew the Type-1 helicopter for only 6.3 hours, dropping 107,348 gallons of water on the fire. It flew the Type-2 helicopter for only 3.1 hours, dropping 6,510 gallons of water on the fire.

   b. On August 19, it flew the Type-1 helicopter for only 2.2 hours, dropping only 41,590 gallons, and the Type-2 flew for 3.3 hours, dropping only 10,540 gallons.

   c. On August 20, the Forest Service flew the Type-1 helicopter for only 2.3 hours, dropping only 39,289 gallons. It did not fly the Type-2 helicopter at all.

   d. On August 21, the Forest Service left both helicopters on the ground and made no water drops whatsoever.

38. The August 19-20 ICS-209 report noted that fire was 0% contained. It also recognized that there was a "critical need for Type-1 or 2 helicopters to slow fire spread in an attempt to keep the fire in its current footprint" and that the planned actions for the next period were to "utilize air resources to slow fire spread."

39. On August 21, 2020, the Forest Service issued its second WFDSS Incident Decision for the Beachie Creek Fire (the "8/21 Incident Decision"). At that point, the fire remained at 10 acres. The 8/21 Incident Decision recognized that the Willamette National Forest was at the "height of fire season" and that "weather events conducive to large fire growth days are still possible." It directed that the fire was still a "full suppression" incident and mandated

Page 9 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

the continued use of "aviation resources to check fire spread while we identify a series of natural and constructed barriers that could possibly serve as containment or check lines." It also recognized that "the strategy of using aviation resources to check fire spread may be effective for the time being, but the strategy is vulnerable to resource availability and to critical fire weather events (east winds for example)."

40. In the August 23-24 ICS-209 report, the Forest Service maintained the Beachie Creek fire as a "full suppression" incident. The Forest Service recognized that if the fire conditions changed significantly, the fire containment could be in jeopardy and the Beachie Creek Fire could become a significant fire event. The Forest Service also recognized that the success of suppression activities would depend on the continued use of its helicopters and that there remained a "critical need" to maintain its aviation resources to "slow fire spread in an attempt to keep the fire in its current footprint." It listed the fire as 0% contained.

41. The ICS-209s through the next six reporting periods – August 24/25 through August 29/30 – maintained the "full suppression" designation, reiterated the "critical need" for continued aerial suppression activities to achieve that goal, and mandated that air resources be utilized to "slow fire spread." All of those ICS-209s also listed the fire as 0% contained.

**G.   The Forest Service Left its Helicopters Sitting Idle on the Ground.**

42. Despite the Forest Service designation of the Beachie Creek Fire as a "full suppression" incident, its mandate to utilize its helicopter assets to suppress and contain the fire, and the availability of those assets, the helicopters sat idle at the heliport.

43. From August 21 through August 23, there was not a single water drop from either the Type-1 or Type-2 helicopter.

44. On August 22, the Forest Service removed the Type-1 helicopter from the Beachie Creek fire.

45. On August 24, the Type-2 helicopter flew only 1.7 hours and dropped 5,400 gallons of water on the fire.

Page 10 – COMPLAINT

46. Between August 25 and August 30, the Forest Service did not make a single water drop on the Beachie Creek Fire.

47. During this same time period, the daily ICS-209s continued to list the fire as 0% contained. In its August 27/28 ICS-209 report, the Forest Service noted that the fire had grown to 23 acres.

48. While the helicopters remained idle on the ground, the helicopter crews grew frustrated with the lack of fire-suppression activity. One pilot noted that, if they had been mobilized during that time, they could have "drowned" the fire with sufficient water drops.

### H. Fire Weather Conditions Deteriorated Quickly.

49. On August 27, 2020, fire weather conditions began to deteriorate. In its August 27/28 ICS-209 report, the Forest Service forecast continuing dry weather and increasing west to northwest winds, with the strongest winds on the ridges and nighttime channeling in the larger canyons.

50. On August 28, 2020, the fire weather forecast continued to worsen. In its August 28/29 ICS-209 report, the Forest Service predicted a series of cold fronts that would bring northwest winds to the area, with the strongest winds on the peaks and channeling again forecast for the canyons.

51. On August 29, 2020, the fire weather forecast noted continued windy conditions, and also predicted the return of warmer, drier conditions.

### I. Despite Worsening Weather Conditions, the Forest Service Helicopters Remained Idle.

52. From August 25 through August 30, there were no helicopter water drops. It was not until August 31 that the Forest Service again deployed aerial assets, but again they were insufficient to meet the suppression and containment objectives.

   a. On August 31, the Type-2 helicopter flew for only 1.8 hours and dropped 6,600 gallons.

Page 11 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

      b. On September 1, the Forest Service assigned another Type-1 helicopter to the Beachie Creek Fire. However, it remained on the ground and made no water drops. The Type-2 helicopter flew for 6.3 hours and dropped 20,800 gallons.

      c. On September 2, the Forest Service assigned another Type-2 helicopter to the fire. However, it remained on the ground, as did the Type-1 helicopter. Neither made any flights or water drops that day. The first Type-1 helicopter flew only 3.6 hours and dropped 11,600 gallons.

      d. On September 3, there were no water drops whatsoever.

53. In this same period, the Beachie Creek Fire grew rapidly beyond the 100-acre threshold for maximizing the likely success of an initial attack. By September 3, 2020, the Beachie Creek fire had grown from 10 to 379 acres. The ICS-209s reports for August 29 and September 3 listed the fire as 0% contained.

**J.**    **Deteriorating Fire Weather Conditions Created a Watchout Situation.**

54. The Forest Service published its third Beachie Creek WFDSS Incident Decision on September 3, 2020 (the "9/3 Incident Decision"). By that time, weather conditions had deteriorated significantly, triggering the "watchout" conditions that the 8/21 Incident Decision had warned of. The weather forecast predicted "very warm, very dry, and potentially very breezy weather west of the Cascades" capable of bringing "hot and dry conditions all the way to the ocean beaches, along with poor or nonexistent overnight humidity recovery for most of the forecast area."

55. The 9/3 Incident Decision directed the continued utilization of aviation resources to "slow fire spread and identify containment lines." The Forest Service mandated the use of "bucket work to suppress fire growth and keep fire confined to [its] current location on [the] landscape."

56. The 9/3 Incident Decision recognized the "significant potential for the Beachie Creek Fire to see continued fire growth and an increase in fire behavior in the next two weeks." The Forest Service recognized that the forecasted high temperatures and extreme low humidity

Page 12 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

accompanied by dry east winds "have historically resulted in large fire growth days on fires in Western Oregon."

57. The 9/3 Incident Decision noted that there were three helicopters assigned to the fire and that additional aviation resources had been ordered. The Forest Service mandated that helicopters "will continue to make water drops along the fire perimeter to slow the fire spread and intensity and prevent it from spreading toward private land in the days to come." The 9/3 Incident Decision directed that full suppression activities would continue, primarily utilizing aviation resources to minimize fire spread.

58. On September 4, 2020, the National Weather Service issued a Fire Weather Watch for much of Oregon for September 7-9, 2020. On September 5, 2020, it added the Willamette National Forest to the list of areas subject to the Fire Weather Watch. It predicted sustained winds between 10-20 mph, with gusts as high as 45 mph and relative humidity as low as 10%. On the afternoon of September 5, the Fire Weather Watch was upgraded to a Red Flag Warning, with predicted sustained winds of 20-30 mph, gusts as high as 60 mph and a relative humidity below 10%.

**K.   Despite the Watchout Conditions and Fire Weather Watch, the Forest Service Continued to Ignore its Incident Decision.**

59. Despite the forecast rapid deterioration of wildland fire weather conditions, the "full suppression" designation, the Incident Decision's directive to utilize helicopters to meet that incident designation mandated goal, and the increased availability of aerial resources, the Forest Service continued to leave its helicopters idle on the ground.

   a. On September 3, 2020, the Forest Service made no aerial water drops whatsoever.

   b. On September 4, the Type-2 helicopters made no water drops and the Type-1 helicopter flew for only 2.2 hours, dropping only 34,170 gallons.

   c. On September 5, one of the Type-2 helicopters remained on the ground, one of the Type-2 helicopters flew for .7 hours, dropping only 1,500 gallons, and the Type-1 helicopter flew for only 4.5 hours, dropping only 72,360 gallons.

Page 13 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

d. On September 6, the Forest Service assigned an additional Type-1 helicopter to the Beachie Creek Fire. However, it did not fly that day. The other Type-1 helicopter only flew for 2.2 hours, dropping 40,200 gallons. One of the Type-2 helicopters remained grounded and the other flew for only 1.6 hours, dropping only 5,700 gallons.

e. On September 7, the Forest Service only utilized the two Type-1 helicopters for water drops. One of them flew for 2.1 hours and dropped 19,000 gallons; the other flew for 2.3 hours and dropped 40,200 gallons. Neither of the Type-2 helicopters made any water drops.

60. During this same period, the Beachie Creek Fire continued to grow. By September 4, the fire had grown to 400 acres, by September 6 it was at 479 acres, and by September 7 it had grown to 776 acres. The ICS-209s for this period continued to list the fire as 0% contained.

### L. As a Result of the Forest Service's Negligent Failure to Follow its Fire Attack Plan, the Beachie Creek Fire Exploded into a Conflagration.

61. On the morning of September 7, 2020, the National Weather Service warned of "EXTREMELY CRITICAL FIRE WEATHER AREA FOR PORTIONS OF NORTHWESTERN OREGON." It predicted wind speeds of up to 75 mph, dry fuels, and a relative humidity of 15–20%. The warning also explained that these factors and high Energy Release Conditions created "a volatile environment supportive of rapidly spreading fires exhibiting extreme behavior."

62. By the evening of September 7, 2020, that prediction came to pass as a significant east-wind event tore through the Pacific Northwest, causing winds gusting to 100 mph in the Cascades. As a result, the Beachie Creek Fire exploded into a massive wildland conflagration. It grew from 776 acres to 132,450 acres in the span of 24 hours. Before it was extinguished by autumn rains, it had consumed nearly 200,000 acres. It tragically killed six people and caused devastating and catastrophic harm to residents and property in Marion County and Linn County.

Page 14 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

**M.      The Forest Service Failed to Comply with its Mandatory Reporting Obligations, Which Are Critical for Necessary Resource Allocation and Planning.**

63.     As part of its response to the Beachie Creek Fire, the Forest Service was required to prepare and submit ICS-209 reports to the appropriate Geographic Area Coordination Center. For the Beachie Creek Fire, the applicable Geographic Area Coordination Center was the Northwest Interagency Coordination Center ("NICC"). ICS-209 reports were required to be submitted to NICC daily until the underlying Beachie Creek Fire "incident" was contained. The Forest Service's directives make clear that the ICS-209 reports are key reporting documents with crucial information upon which important firefighting decisions are made: the ICS-209 report is a "critical interagency reporting tool giving daily 'snapshots' of the wildland fire management situation and individual incident information which include cost, critical resource needs, fire behavior, size, etc." Moreover, "[a]ccurate and timely completion of the [ICS-]209 is necessary to determine appropriate resource allocation during multiple incident occurrences. In conjunction with other sources of information, the information included on the [ICS-]209 is used by managers to determine the priority of an incident and allocation of scarce resources."

64.     Based on documents received in response to FOIA requests to the Forest Service and NICC (including those in the storage portal that was made available to the NICC), it appears that the Forest Service failed entirely to complete ICS-209 reports on numerous days and, for other days, failed to submit the ICS-209 reports to the NICC, meaning that NICC's vital resource allocations and other decisions were not fully informed by the developing facts on the ground. These apparent reporting gaps and communication failures occurred at or around the time that key decisions were or should have been made, including for instance the decision to relocate the Type-1 (Boeing CH-47D "Chinook") helicopter on or about August 22, 2020. Some of the ICS-209 reports that were provided to the NICC during this key time period were missing at least some of the requested information.

Page 15 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

**N.  As a Result of the Forest Service's Negligent Failure to Follow its Fire Attack Plan and/or to Comply with its Mandatory Reporting Obligations, Plaintiffs Incurred Significant Damages.**

65.  As a result of the Forest Service's negligent acts and omissions alleged herein, Marion County and Linn County have incurred significant damages, including destruction of and damage to structures, real property and personal property owned by Plaintiffs, costs to repair and replace damaged equipment, costs to remove debris, costs incurred for materials and personnel to provide emergency services to residents of the counties, and other related costs and expenses arising from the Beachie Creek Fire.

66.  Taking into account and deducting payments received from the Federal Emergency Management Agency for a portion of the damages incurred by Plaintiffs, Marion County has incurred damages in the estimated amount of $4,000,000.00 and Linn County has incurred damages in the estimated amount of $600,000.00, with specific amounts to be proven at trial.

## VI.   CLAIMS FOR RELIEF.
### FIRST CLAIM FOR RELIEF
**(Negligence)**

67.  Plaintiffs reallege the allegations in paragraphs 1-66 above.

68.  Beginning on August 16 and continuing for over two weeks through September 6, 2020, the Forest Service consistently designated the Beachie Creek Fire as a "full suppression" incident and directed that helicopters drop water on the fire to meet containment goals. This designation and direction was specific, defined with precision and required the agency to "put the fire out as efficiently and effectively as possible, while providing for firefighter and public safety." Despite these specific, mandatory policy dictates and a clear understanding of the massive risk to life and property if fire conditions worsened as was common in August and September in Western Oregon, the Forest Service repeatedly failed to utilize the readily available helicopters staged in locations just minutes from the fire with speedy bucket refill access in nearby Detroit Lake.

Page 16 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

69. In failing to fully suppress the Beachie Creek Fire (and to otherwise prevent foreseeable damage to Plaintiffs), the Forest Service was negligent in the following particulars:

   a. Failing to utilize available aviation resources to aggressively attack the Beachie Creek Fire for over two weeks when the fire was extremely small and when helicopter water drops could have been executed under conditions and with equipment that was virtually certain to put the fire out and did not jeopardize firefighter or public safety;

   b. Failing to mount an aggressive initial attack to put the fire out despite knowing that the risks of a catastrophic wildfire were increasing and that helicopter resources, if properly deployed, had an extremely high likelihood of success; and

   c. Failing to comply with its mandatory obligation to prepare and submit to the NICC the critical daily ICS-209 reports at or around the time that key decisions were or should have been made regarding the Beachie Creek Fire.

70. As a direct result of the Forest Service's negligence, Plaintiffs suffered significant damages which in the aggregate total an estimated $4,600,000.00.

## SECOND CLAIM FOR RELIEF
**(Negligence *Per Se*)**

71. Plaintiffs reallege the allegations in paragraphs 1-66 above.

72. Under ORS 477.066, every owner of forestland in Oregon on which a fire exists or from which it may spread is obligated to control and extinguish such fire when its existence comes to that forestland owner's attention and is further required to continue such actions until the fire is extinguished. As alleged above, the Forest Service repeatedly violated this statutory duty by failing to take reasonable and available actions to suppress the Beachie Creek Fire.

73. Beginning on August 16 and continuing for over two weeks through September 6, 2020, the Forest Service consistently designated the Beachie Creek Fire as a "full suppression" incident and directed that helicopters drop water on the fire to meet containment goals. This designation and direction was specific, defined with precision and required the agency to "put the fire out as efficiently and effectively as possible, while providing for firefighter and public safety." Despite these specific, mandatory policy dictates and a clear understanding of the

Page 17 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

massive risk to life and property if fire conditions worsened as was common in August and September in Western Oregon, the Forest Service repeatedly failed to utilize the readily available helicopters staged in locations just minutes from the fire with speedy bucket refill access in nearby Detroit Lake.

74. In failing to fully suppress the Beachie Creek Fire (and to otherwise prevent foreseeable damage to Plaintiffs), the Forest Service was grossly negligent in the following particulars:

   a. Failing to utilize available helicopter resources to aggressively attack the Beachie Creek Fire for over two weeks when the fire was extremely small and when helicopter water drops could have been executed under conditions and with equipment that was virtually certain to put the fire out and did not jeopardize firefighter or public safety;

   b. Failing to mount an aggressive initial attack to put the fire out despite knowing that the risks of a catastrophic wildfire were increasing and that helicopter resources, if properly deployed, had an extremely high likelihood of success; and

   c. Failing to comply with its mandatory obligation to prepare and submit to the NICC the critical daily ICS-209 reports at or around the time that key decisions were or should have been made regarding the Beachie Creek Fire.

75. As a direct result of the Forest Service's negligence *per se*, Plaintiffs suffered significant damages, which in the aggregate total an estimated $4,600,000.00.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. For Judgment in their favor;

2. On their First and Second Claims for Relief, for compensatory damages in an amount to be specifically proven at trial but currently estimated at $4,600,000.00;

3. For their costs and disbursements; and

4. For other relief that the Court deems to be just and equitable under the circumstances.

Page 18 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon  97205
(503) 241-2300 main · (503) 778-5299 fax

DATED this 13th day of May, 2024.

        DAVIS WRIGHT TREMAINE LLP

        By: /s/ *John DiLorenzo, Jr.*
            JOHN DILORENZO, JR., OSB #802040
            johndilorenzo@dwt.com
            AARON K. STUCKEY, OSB #954322
            aaronstuckey@dwt.com
            DAVIS WRIGHT TREMAINE LLP
            560 SW 10th Ave, Suite 700
            Portland, Oregon 97205
            Telephone: (503) 241-2300
            Facsimile: (503) 778-5299

Page 19 – COMPLAINT

4883-5623-4685v.5 0106057-000009

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Ave, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax